**FILED**

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

FEB 0 6 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| United States of America | ) |
| v. | ) |
| | ) |
| | ) |
| Christopher Lee | ) |
| | ) |
| | ) |
| Defendant(s) | |

Case No.  2:17 mJ 0025 KJN

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ▮▮▮▮▮▮ in the county of _____ Placer _____ in the
_____ Eastern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
| 18 U.S.C. § 2251 | Production of Child Pornography |

This criminal complaint is based on these facts:

(see attachment)

☒  Continued on the attached sheet.

_____
Complainant's signature

SA NICOLE SOLANDER
Printed name and title

Sworn to before me and signed in my presence.

Date:  2/4/17

City and state:  Sacramento, CA

_____
Kendall J. Newman  Signed Telephonically 1:5pm 2/4/17
Judge's signature

Kendall J. Newman, U.S. Magistrate Judge
Printed name and title

1

2 **AFFIDAVIT IN SUPPORT OF SEARCH AND ARREST WARRANTS**

3 I, Nicole Solander, being duly sworn on oath, depose and say:

4     1.    I am a Special Agent with the United States Department of Homeland Security (DHS),

5 Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am presently

6 assigned to the Office of the Assistant Special Agent in Charge (ASAC), Sacramento, California. In

7 2002 and 2009, I received training as a Special Agent at the Federal Law Enforcement Training Center

8 (FLETC) in Glynco, Georgia, where I received instruction on federal criminal laws regarding financial

9 crimes, alien smuggling and trafficking, customs violations to include child exploitation and other

10 crimes in violation of the Immigration and Nationality Act (INA), Title 8 of the United States Code

11 (U.S.C.), and Title 18 of the U.S.C. I have been employed as a Special Agent with DHS for over

12 fourteen (14) years.

13     2.    My duties as a Special Agent include the development and evaluation of information in

14 order to detect violations of federal law; more specifically, criminal violations relating to child

15 exploitation, including violations pertaining to the illegal production, distribution, receipt and possession

16 of visual depictions of minors engaged in sexually explicit conduct and child pornography (as those

17 terms are defined in 18 U.S.C. § 2256 and hereinafter referred to collectively as "child pornography") in

18 violation of 18 U.S.C. §§ 2251, 2252(a), and 2252A. I have received training in child pornography and

19 child exploitation investigations. I have observed and reviewed numerous examples of child

20 pornography in all forms of media, including computer media. I have participated in over 60 child

21 exploitation search warrants (both federal and with the Sacramento Valley Internet Crimes Against

22 Children (ICAC) Task Force) involving the use of computers and Internet, and have assisted in the

23 gathering of evidence during execution of those warrants. I am familiar with the information contained

24 in this affidavit based upon the investigation I have conducted and based on my conversations with other

25 law enforcement officers and information received from the Hertfordshire Constabulary in the United

26 Kingdom, and other law enforcement agencies, who have engaged in numerous investigations involving

27 child pornography.

28

1

1

**Introduction**

2     3.      I submit this application and affidavit in support of a search warrant authorizing the

3 search of ██████████████████████ (hereinafter "SUBJECT PREMISES") and the arrest

4 of CHRISTOPHER LEE. The SUBJECT PREMISES is located in the Eastern District of California, as

5 further described in Attachment A. I believe that located within the SUBJECT PREMISES there is

6 evidence, fruits, and instrumentalities of the criminal violations which relate to the knowing production,

7 distribution, and transportation of child pornography, in violation of 18 U.S.C. §§ 2251, 2252, and

8 2252A. I request authority to search the entire SUBJECT PREMISES, including the residential

9 dwelling and surrounding grounds, garages, storages rooms or outbuildings of any kind, located on the

10 SUBJECT PREMISES, and any computer and computer media located therein, where the items

11 specified in Attachment B may be found, and to seize all items listed in Attachment B as

12 instrumentalities, fruits, and evidence of the crime. In addition, I am aware that child pornography

13 offenders have maintained or left evidence of their crimes in their vehicles. I request that the search

14 warrant authorize the search of vehicles under the dominion and control of the person(s) residing at the

15 SUBJECT PREMISES.

16     4.      The statements in this affidavit are based in part on information provided by other law

17 enforcement agents, as well as my own investigation of this matter. Since this affidavit is being

18 submitted for the limited purpose of securing a search warrant, I have not included each and every fact

19 known to me concerning this investigation. I have set forth only the facts that I believe are necessary to

20 establish probable cause to believe that evidence, fruits, and instrumentalities of the violation of 18

21 U.S.C. §§ 2251, 2252 and 2252A are presently located at the SUBJECT PREMISES.

22

**Statutory Authority**

23     5.      This investigation concerns violations of 18 U.S.C. §§ 2251, 2252, and 2252A, relating to

24 material involving the sexual exploitation of minors.

25      Title 18, United States Code, Section 2251 punishes:

26          (a) Any person who employs, uses, persuades, induces, entices, or coerces any minor to

27          engage in, or who has a minor assist any other person to engage in, or who transports any

28          minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the

1   United States, with the intent that such minor engage in, any sexually explicit conduct for the

2   purpose of producing any visual depiction of such conduct or for the purpose of transmitting a

3   live visual depiction of such conduct, shall be punished as provided under subsection (e), if

4   such person knows or has reason to know that such visual depiction will be transported or

5   transmitted using any means or facility of interstate or foreign commerce or in or affecting

6   interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted

7   using materials that have been mailed, shipped, or transported in or affecting interstate or

8   foreign commerce by any means, including by computer, or if such visual depiction has

9   actually been transported or transmitted using any means or facility of interstate or foreign

10  commerce or in or affecting interstate or foreign commerce or mailed.

11  (b) Any parent, legal guardian, or person having custody or control of a minor who knowingly

12  permits such minor to engage in, or to assist any other person to engage in, sexually explicit

13  conduct for the purpose of producing any visual depiction of such conduct or for the purpose

14  of transmitting a live visual depiction of such conduct shall be punished as provided under

15  subsection (e) of this section, if such parent, legal guardian, or person knows or has reason to

16  know that such visual depiction will be transported or transmitted using any means or facility

17  of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if

18  that visual depiction was produced or transmitted using materials that have been mailed,

19  shipped, or transported in or affecting interstate or foreign commerce by any means, including

20  by computer, or if such visual depiction has actually been transported or transmitted using any

21  means or facility of interstate or foreign commerce or in or affecting interstate or foreign

22  commerce or mailed.

23  Title 18, United States Code, Section 2252(a) punishes Any person who--(1) knowingly transports

24  or ships using any means or facility of interstate or foreign commerce or in or affecting interstate or

25  foreign commerce by any means including by computer or mails, any visual depiction, if--(A) the

26  producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

27  and(B) such visual depiction is of such conduct

28  Title 18, United States Code, Section 2252A(a), makes it a crime for any person to knowingly

3

1   mail, transport, ship, possess, receive, distribute, or reproduce for distribution any child pornography in

2   interstate or foreign commerce by any means, including by computer; or to knowingly distribute, offer,

3   send, or provide to a minor any visual depiction, including any photograph, film, video, picture, or

4   computer-generated image, whether made or produced by electronic, mechanical, or other means, where

5   such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct that has been

6   mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer.

7   **Definitions**

8     6.  For purposes of this warrant, relevant specialized and technical terms are defined as

9   follows:

10       a. The term "minor," "sexually explicit conduct," "visual depiction," "producing," "child

11        pornography," and "child erotica" as used herein, are defined as set forth below:

12         i. Minor is defined as any person under the age of eighteen years. 18 U.S.C. §

13           2256(1).

14         ii. Sexually explicit conduct means actual or simulated - (i) sexual intercourse,

15           including genital-genital, oral-genital, anal-genital, or oral-anal, whether between

16           persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic

17           or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of

18           any person. 18 U.S.C. § 2256(2).

19         iii. Visual depiction includes undeveloped film and videotape, and data stored on

20           computer disk or by electronic means which is capable of conversion into a visual

21           image. 18 U.S.C. § 2256(5).

22         iv. Producing means producing, directing, manufacturing, issuing, publishing, or

23           advertising. 18 U.S.C. § 2256(3).

24         v. Child pornography means any visual depiction, including any photograph, film,

25           video, picture, or computer or computer-generated image or picture, whether

26           made or produced by electronic, mechanical, or other means of sexually explicit

27           conduct, where  – (A) the production of such visual depiction involves the use of

28           a minor engaging in sexually explicit conduct; (B) such visual depiction is a

digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct[.] 18 U.S.C. § 2256(8).

    vi.  Child erotica are images depicting minors in the nude or scantily clad in age-inappropriate clothing, striking sexually provocative poses intended to illicit a sexual response.  The images may not meet the definition of sexually explicit conduct, but are often found in child pornography collections.

b.  The term "computer" is defined under 18 U.S.C.§ 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to operating in conjunction with such device."

c.  Computer hardware consists of all equipment that can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data.  Hardware includes, but is not limited to, any data processing devices (such as central processing units, self-contained laptop and notebook computers, hand-held electronic organizers, personal digital assistants, and WebTV units), removable media, internal and external storage devices (magnetic storage devices such as hard disk drives, diskette drives, and tape drives, optical storage devices such as CD-ROM drives, CD-R/CD-RW recorders, and DVD drives/recorders, and other memory storage devices), and related communication devices such as modems, cables, connectors, programmable telephone dialing or signaling devices, and electronic tone-generating devices, and any devices, mechanisms, or parts that can be used to restrict access to computer hardware such as physical keys and locations.

d.  A system peripheral is a piece of equipment that sends data to, or receives data from, a computer.  Keyboards, mouses, cameras, webcams, video cameras, printers, scanners, plotters, video display monitors, and certain types of facsimile machines are examples of peripherals.

e.  Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Software is stored in electronic, magnetic, optical, or other digital form.  It commonly includes programs to run operating systems, applications (like word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

f.  Computer-related documentation consists of written recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

g.  Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password or pass-phrase (string of alphanumeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, cards, and circuit boards.  Data security software or digital code may include a programming code that creates "test" keys or "hot" keys, which perform certain preset security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

h.  Storage media includes any material capable of storing information in a manner that can be used by computer hardware to save and/or retrieve information.  Examples of storage media include diskettes, CD-ROMs, DVDs, magnetic tapes, ZIP disks, JAZ disks, thumb drives, and EPROMS.

i.  The Internet is defined as a non-commercial, worldwide network of computers.  It is a self-governing network devoted mostly to communication and research and has millions of users worldwide.  The Internet is not an online service but a collection of tens of thousands of computer networks, online services, and single user components.

j.  Internet Protocol (IP) is the primary protocol upon which the Internet is based.  It allows information to travel through multiple networks on the way to its final destination.

k.  An IP address is a unique number assigned to every computer directly connected to the Internet (for example 190.25.240.1).  The IP address consists of four parts, is unique to each machine, and can be used to identify a particular machine on the network, at a particular time and date.

l.  An Internet Service Provider (ISP) is a business that allows a user to connect to the Internet through its computers for a fee.  Internet Service Providers usually provide an Internet connection, an electronic mail (e-mail) address, and sometimes Internet browsing software.  A user also may connect to the Internet through a commercial online service such as CompuServe or America Online (AOL).  With this service, users may also have access to other features such as chat rooms and searchable databases.

m.  "Domain Name" refers to the common, easy to remember names associated with an Internet Protocol address.  For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations.  Second level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the world wide web server located at the United States Department of Justice, which is part of the United States government.

n.  "Log Files" are records automatically produced by computer programs to document electronic events that occur on computers.  Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors.  Logs are often named based on the types of information they contain.  For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed

from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

o. "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

p. "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

q. A "JPEG" is a graphic image file. Other known graphic image files include, but are not limited to, "GIF," "TIFF," RAW," and "BMP."

r. An "MPEG" is a video image file. MPEG files are generally larger than JPEG files and require the user to have a computer with sufficient processor speed, internal memory, and empty hard disk space. MPEG viewer software is also needed to play the files.

s. The Uniform Resource Locator (URL) is the address of a resource or file located on the Internet, also called a "domain name."

t. A webcam is a video capture device connected to a computer or computer network. The video captured by the device is broadcast over the internet to be viewed by other internet users in real time. The term "Webcam" can also be used to describe a file transfer between two individuals on the internet. An individual playing a video file saved to their own computer can broadcast the video to another user's computer screen through an internet connection.

u. Screen capture software is a software application that copies what is currently displayed on a user's computer screen to an electronic file or printer. The electronic file can then be viewed as a video. This video depicts everything that was displayed on the original user's computer screen. This software can record real time chat sessions, key strokes, mouse movement, video and audio displayed on the user's screen.

v. In addition, as used in this affidavit, "records," "documents," and "materials" include items in whatever form and by whatever means they may have been created and/or

1 stored. This includes any handmade, photographic, electrical, electronic, and magnetic

2 forms. It also includes items in the form of computer hardware, software, documentation,

3 passwords, and data security devices.

4 **CHARACTERISTICS COMMON TO CHILD PORNOGRAPHY OFFENDERS**

5 7. Based upon my training and experience, I am aware that the following characteristics are

6 generally found in varying combinations in people who produce, receive, possess, distribute, and/or

7 transport child pornography ("Child Pornography Offenders"):

8 a. They view children as sexual objects.

9 b. They collect sexually explicit and other erotic images of minors which they use for their

10 own sexual gratification and fantasy.

11 c. They keep sexually explicit images of minors because the images are treated as prized

12 possessions. They store such images in different formats including photos, printouts,

13 magazines, videotapes, and forms of digital media such as hard drives, diskettes, and CD-

14 ROMs. They store such images in different places including their home, their car, and

15 other areas under their control.

16 d. They may use sexually explicit images of minors as a means of reliving fantasies or actual

17 sexual encounters. They also use the images as keepsakes and as a means of gaining

18 acceptance, status, trust, and psychological support by exchanging, trading, or selling the

19 images to other people with similar interests.

20 e. They go to great lengths to conceal and protect from discovery their collection of sexually

21 explicit images of minors. They may have passwords, to access programs or to control

22 encryption, which are written down and located in the vicinity of their computer, or

23 located on their person. They may place child pornographic files in directories or folders

24 on their computer or other digital storage media, not typically reserved for image or video

25 files. They may use encryption software to protect their child pornographic files. They

26 may change file names of sexually explicit images in an attempt to hide such images from

27 a forensic review. They may change the extension on such image files in an effort to

28 disguise them as a word processing file. They may also transfer such files downloaded

9

1    from the internet to removal storage media including but not limited to computer disks,

2    thumb-drives, digital cameras, smart cards, and cellular phones, and then attempt to erase

3    the files from computer hard drives, in an effort to hide evidence of their download

4    activity.

5    f.   If a child pornography offender has had sexual contact with a minor, it is likely such

6    person has visual depictions of minors with whom they have had sexual contact.  If a

7    picture of a minor is taken by such a person depicting the minor in the nude, there is a

8    high probability the minor was used to produce sexually explicit images to be traded with

9    people with similar interests.  If pornographic depictions of a minor were produced as

10   mentioned above, an analysis of the cameras, scanners, or webcams in the possession of

11   the subject may yield clues as to what device was used in the commission of such crime.

12   Such analysis would require the removal of the device to a laboratory setting.

13   g.   If child pornography is found on the hard drive of a child pornography offender's

14   computer, and the computer was connected to the Internet, there is a strong likelihood that

15   the person received the images of child pornography from the Internet, either from

16   internet websites devoted to child pornography, or from other individuals who sent the

17   images directly via email.

18   h.   I also know from my own training and experience and the training and experience of other

19   agents with whom I work, that child pornography offenders who acquire sexually explicit

20   images of minors from the Internet, will typically bookmark the locations (i.e. websites,

21   news groups and other locations) on the Internet from which they accessed child

22   pornographic images.   By bookmarking such locations, these collectors can readily gain

23   access to such sites.

24   i.   I know from my own training and experience and the training and experience of other

25   agents with whom I work with, that child pornography offenders also tend to collect child

26   erotica because it is more readily available, partially satisfies their sexual fantasies, and is

27   often intermixed with child pornography on the Internet.

28   j.   I also know from my training and experience, and the experience of other agents with

whom I work with, that child pornography offenders often will collect graphic sexual stories relating to the sexual abuse of children, as they too are used to satisfy their sexual fantasies.

## TOOLS OF THE INTERNET

8.   I know from my training and experience that individuals who receive, possess, distribute, and transport child pornography often use the Internet to increase the number of images in their collection. The Internet provides users with access to websites and social networking sites from which images of child pornography can be downloaded and uploaded. In addition, the Internet allows communications with others who express an interest in child pornography and permits the transfer of data and images across state and foreign boundaries. Individuals who use the Internet can communicate electronically by using e-mail. E-mail messages can contain text, data, or graphic images. This type of communication is private in that it is directed from one Internet user to another. Internet users can also communicate and trade images of child pornography using Instant Messaging. Instant Messaging is "real time" communication in that the persons communicating are engaging in online dialog. This means of communication, like e-mail, is private in that it is one Internet user communicating specifically, and exclusively, with another.

9.   Digital evidence of the results of web browsing can often be found on the hard drive of a computer during a forensic examination. In addition, the dialog and image downloads created when corresponding via email and instant message are generally stored in the hard drive of a computer until overwritten by other correspondence, and are usually retrievable during a forensic examination of the computer. This is true, even if the computer user has deleted the data.

## SEARCH AND SEIZURE OF COMPUTERS AND RELATED
## STORAGE MATERIALS IN GENERAL

10.   Based on my own experience and conversations with other agents, I know that information stored in an electronic format may be found not only on the hard disk drive of a computer, but also on other computer hardware, peripherals, and storage media. In addition, to conduct a thorough search of computers, agents are often required to seize most or all of the computer hardware, peripherals,

and other storage media, to be searched later by a review team in a controlled environment.  This is true for the following reasons:

    a.  Volume of Evidence: Computers and storage devices (like hard disks, diskettes, tapes, CD-ROMs, DVDs, and zip drives) can store the equivalent of thousands of pages of information. Also when the user wants to conceal criminal evidence, he or she may store it in many places, in random order, and with deceptive file names.  This requires the review team to examine all the stored data to determine whether it is included in the warrant.  This sorting process can take several weeks to conduct, and it would be impractical to attempt this kind of data search on site.

    b.  Technical Requirements:  Searching computer systems is a highly technical process that requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment needed to conduct a thorough search.  In addition, it may be necessary to consult with personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

    c.  In order to retrieve electronically stored evidence from a computer, agents may be required to seize most or all of a computer system's equipment, including hardware, peripherals, software, documentation, security devices, and passwords.  This is true because of the following:

        i.  Certain operating systems and hardware can be configured to operate only with a precise set of hardware, software, and peripherals.

        ii.  Peripheral devices that allow users to enter or retrieve data from the storage devices may vary in their compatibility with other hardware and software.

        iii.  The review team may have to install software used by the suspect on a government computer in order to retrieve the information the suspect may have stored using that software.  The review team may also need to refer to hardware and software documentation maintained by the suspect to complete an analysis in

12

a timely manner. The suspect's computer documentation may also contain hand-written notes specific to the seized computer system.

d.  The Nature of Data Storage: Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. The search for these files and file fragments can take considerable time, depending on the computer user's practices. It often takes weeks or months to complete such a search, particularly if many hard drives and other storage media are seized from the location to be searched. A thorough search for such relevant evidence would be impractical during an on-site preview.

11.  As further described in Attachment B, this warrant seeks permission to locate in the SUBJECT ITEMS not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, and

1   who used them.  Additionally, the warrant seeks information about the possible location of other

2   evidence, or about persons who may know things helpful to the investigation at issue.

3       12.    Further, as described above and in Attachment B, this application seeks permission to

4   search and seize records that might be found on the SUBJECT ITEMS, in whatever form they are found.

5   One form in which the records might be found is that they are stored on a computer's hard drive, or other

6   electronic media.  Some of these electronic records might take the form of files, documents, and other

7   data that is user-generated.  Some of these electronic records, as explained below, might take a form that

8   becomes meaningful only upon forensic analysis of the computer(s) or other electronic storage media

9   seized.

10      13.    Although some of the records called for by this warrant might be found in the form of

11   user-generated documents (such as word processor, picture, and movie files), computer hard drives can

12   contain other forms of electronic evidence as well.  In particular, records of how a computer has been

13   used, the purposes for which it was used, and who has used it are called for by this warrant.  As

14   described above, data on the hard drive not currently associated with any file can provide evidence of a

15   file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file

16   (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems

17   can leave traces of information on the hard drive that show what tasks and processes on the computer

18   were recently in use.  Web browsers, e-mail programs, and chat programs store configuration

19   information on the hard drive that can reveal information such as online nicknames and passwords.

20   Operating systems can record additional information, such as the attachment of peripherals (eg. Cameras

21   and printers for creating or producing images), the attachment of USB flash storage devices, and the

22   times and dates the computer was in use.  Computer file systems can record information about the dates

23   files were created and the sequence in which they were created.  This information can sometimes be

24   evidence of a crime, or can point toward the existence of evidence in other locations.  Evidence of this

25   type is a conclusion, based on a review of all available facts and the application of knowledge about how

26   a computer behaves.  Therefore, contextual information necessary to understand the evidence described

27   in Attachment B also falls within the scope of the warrant.

28

14

1    14.    In finding evidence of how a computer has been used, the purposes for which it was used,
2  and who has used it, sometimes it is necessary to establish that a particular item is not present on a drive.
3  For example, I know from training and experience that it is possible that malicious software can be
4  installed on a computer, often without the computer user's knowledge. This software can allow a
5  computer to be used by others. To investigate the crimes described in this warrant, it might be necessary
6  to investigate whether any such malicious software is present on the computer, and, if so, whether the
7  presence of that malicious software might explain the presence of other things found on the computer's
8  hard drive.

9    15.    Upon searching the SUBJECT ITEMS, law enforcement personnel trained in searching
10  and seizing computer data will seize the computer equipment and transport it to an appropriate law
11  enforcement laboratory for review. The computer equipment and storage devices, any search of,
12  electronic media, on or off site will be performed by a review team in accordance and as defined by the
13  review protocols described below in order to extract and seize any data that falls within the list of items
14  to be seized as set forth in Attachment B.

15    16.    In order to fully retrieve data from a computer system, the review team needs all
16  electronic storage devices as well as the computer's central processing unit (CPU). As in this case where
17  the evidence consists partly of graphic files, the monitor and printer are essential to show the nature and
18  quality of the graphic images which the system could produce. In addition, the review team needs all the
19  system software (operating systems or interfaces and hard drive drivers) and any application software
20  which may have been used to create the data (whether stored on hard drives or on external media).
21  Where there is probable cause to believe that the computer and its storage devices, the monitor,
22  keyboard, and modem, hardware and software are all instrumentalities of the crime of receipt,
23  possession, distribution, or transportation of child pornography in violation of federal law, they should
24  also all be seized as such.

25    17.    If the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure
26  41(b), the government will return these items in a reasonable amount of time not to exceed 120 days
27  from the date of seizure unless further authorization is obtained from the Court. Due to the review team
28  protocols described below, the examination and evaluation of seized electronic devices is expected to

15

1  take a considerable amount of time due to the limited forensic resources available. It is for this reason,

2  this affiant respectfully requests the 120-day period of review.

3    18.    No wire communications or electronic communications shall be intercepted during the

4  execution of this search warrant. I have no information to indicate that the computer(s) to be searched

5  operate in any way as a server of an electronic bulletin board service, Internet web site host, Internet file

6  transfer protocol server, Internet chat server, or Internet email forwarder or server. As such, it would

7  appear that the provisions of the Wire and Electronic Communications Interception Act, 18 U.S.C.

8  Section 2510 et seq., do not apply. Should information of this type be discovered, the Government will

9  preserve it and set it aside.

10    **SPECIFIC METHODS FOR SEARCH OF DIGITAL EVIDENCE**

11    19.    Your affiant is seeking authority to search for, among other things, items containing

12  digital data, more particularly described in Attachment B. As many devices commonly found in a

13  residence may contain digital data, your affiant will make every reasonable effort to minimize seizures to

14  only those devices for which there is reason to believe might be found:  1) evidence or fruits of the

15  aforementioned crimes; 2) contraband implicated by this affidavit; and 3) property/instrumentalities

16  designed for use, intended for use, or used in the commission of the aforementioned crimes. If personnel

17  trained in the forensic preview of digital evidence are available, and if doing so will not extend the

18  duration of the search to an unreasonable time. Your affiant intends for there to be an on-scene preview

19  of the digital evidence in order to minimize the amount of material which needs to be removed from the

20  premises. Your affiant is aware that certain tools are available to trained personnel which make such

21  previews possible under certain circumstances. Such a preview generally consists of reviewing images

22  and videos contained on digital media, and searching for filenames which appear to contain references to

23  child pornography. These previews are done in a manner which preserves the integrity of the data on the

24  device. A forensic preview is not a substitute for a forensic examination, but in certain instances (such as

25  when it is possible through interviews to determine which items belong to uninvolved third parties), an

26  on-site forensic preview can be a useful tool in minimizing the number of digital devices that need to be

27  removed from the premises for a full forensic examination. If an item which may reasonably contain

28  evidence of child pornography cannot be eliminated from suspicion, your affiant intends to remove it to a

1  laboratory setting for a more detailed forensic examination by the review team, in accordance with the
2  parameters described below.

3       20.     As previously mentioned, the search of a computer hard drive or other computer storage
4  medium is a time-consuming manual process often requiring months of work. Your affiant is aware that
5  the seizure of a computer hard drive, by necessity, provides the seizing agency with potential access to
6  data outside the scope of this warrant. A search protocol will be utilized to uncover evidence,
7  instrumentalities and contraband set forth in Attachment B for which there is probable cause. As part of
8  the search protocol, your affiant intends to direct the review team to search any computer and computer
9  storage medium for those items contained in Attachment B. As it concerns this particular case, your
10  affiant intends to direct the review team to search digital media with some or all of the following
11  methods, not listed in any particular order; however, the listing of these methods is not a representation
12  that these specific techniques will be employed in this case:

13       a.  Keyword Searches: Your affiant is aware that computer forensic utilities provide the
14          capability for a user to search for specific key words which may exist on a piece of digital
15          media. Your affiant intends to use specific keywords known to be related to either the
16          subject's illicit internet activities or child pornography. As it concerns child
17          pornography, examples of such keywords include, but are not limited to "preteen,"
18          "hussyfan," and "r@ygold." Those keyword searches will indicate files and other areas
19          of the hard drive that need to be further reviewed to determine if those areas contain
20          relevant data. A list of keywords utilized will be maintained with the records of the
21          forensic examination.

22       b.  Data Carving: Your affiant is aware that, as previously mentioned, data residue may be
23          left in the "free," "unallocated," or "slack" space of a computer hard drive, that is, the
24          space not currently used by active files. Your affiant is further aware that, as previously
25          mentioned, many operating systems utilize temporary storage often referred to as "swap
26          space" on the hard drive to store contents from main system memory. Such unallocated
27          and swap space may contain the residue of files which can be carved out, often in an
28          automated or semi-automated fashion. Your affiant intends to use forensic tools to carve

17

1    out files, in particular, image files such as JPEG and GIF files.  The mere act of carving

2    out such files does not expose your affiant to the contents of such recovered files, but

3    makes those files available for further relevancy checks, such as keyword searches

4    (explained above) and hash value comparisons (explained below).

5    c.  Hash Value Comparisons: Your affiant is aware that computer forensic utilities provide

6    the capability to utilize a function known as a hash algorithm.  A hash algorithm uses a

7    mathematical formula to analyze the data composing a file, and to generate a unique

8    "fingerprint" for that file.  The act of hashing a piece of data does not reveal to an

9    investigator any information about the contents of that data.  However, your affiant is

10   aware that computer forensic applications often contain databases of known hash values

11   for files.  Some of those files are "ignorable," which enables other forensic processes to

12   ignore files (such as the Windows operating system) that are not evidentiary in nature.

13   Some of the files are "alert" files, such as the Child Victim Identification Program

14   (CVIP) hash set, that contains hash values for a small subset of the identified picture and

15   video files for known victims of child pornography.  CVIP alert files notify an examiner

16   that a file appears to contain known depictions of child pornography.  Your affiant seeks

17   permission to utilize automated hash value comparisons to both exclude irrelevant files,

18   and to locate known child pornography files.  Hash value comparisons are useful, but not

19   definitive, as even a single-bit change to a file will alter the hash value for the file.  The

20   forensic review team does not intend to rely solely on hash value comparisons, but

21   intends to utilize them in order to assist with identifying relevant evidence.  The use of

22   this search method is intended to narrow the search.  A search of known hash values,

23   however, will not be used exclusively, because your affiant knows that when previously

24   identified images of child pornography are found on a target's computer, typically there

25   are many more images of child pornography depicting unknown child victims.  Using a

26   hash value search method exclusively would not uncover these images of unknown child

27   victims as well as other evidence authorized by this warrant and described in Attachment

28   B.

d. Opening Container Files, Encrypted Volumes, Embedded Files: Your affiant is aware that relevant data may be compressed, encrypted, or otherwise embedded in other files or volumes. It is often not possible through any automated process to examine the contents of such containers without opening them, just as it is not possible to examine the contents of a locked safe without first opening the safe. In the event that compressed, encrypted, or otherwise embedded files or volumes may exist on the seized items, your affiant intends to use sophisticated forensic tools to attempt to open any such container files which may reasonably contain evidence of child pornography.

e. File Header/Extension Checks: Your affiant is aware that individuals involved in illegal activities on a computer often change the extension of a file (such as .jpg) to some other incompatible extension (such as .txt) in order to disguise files from casual observers. The extension of a file, however, is not necessarily linked to the "header" of a file, which is a unique marking imbedded automatically in many types of files. By comparing the extension of a file with the "header information" of a file, it is possible to detect attempts to disguise evidence of illegal activities. Such a comparison can be made in an automated process by computer forensic tools. Your affiant intends to run an automated header comparison to detect such efforts, and intends to review any such files which reasonably may contain evidence of child pornography.

f. Thumbnail / Image Views: Although hash value comparisons can positively identify known child pornography depictions, a negative hash value comparison does not exclude an image from suspicion. There is no known alternative for visually inspecting each image file. Your affiant therefore intends to examine at least a thumbnail image of each image file on the digital media whether "live," data carved, or identified by header.

g. Registry / Log File Checks: Your affiant is aware that it is necessary in any criminal case to establish not only that a crime has occurred, but also to establish what person committed that crime. Operating systems and computer programs often maintain various administrative files such as logs which contain information about user activities at certain times. In the Windows operating system, for example, some of these files are

19

collectively referred to as "the registry." Such files contain specific information about users, often including email addresses used, passwords stored, and programs executed by a particular user. These files may also contain evidence regarding storage devices which have been connected to a computer at some time. Multiple backup copies of such files may exist on a single computer. Your affiant intends to examine these files to attempt to establish the identity of any user involved in the receipt, possession, distribution, and transportation of child pornography, and to establish methods (such as software used) and dates of this activity.

     h.   Metadata / Alternative Data Streams: Your affiant is aware that many file types, operating systems, and file systems have mechanisms for storing information which is not immediately visible to the end user without some effort. Metadata, for example, is data contained in a file which is not usually associated with the content of a file, but is often associated with the properties of the application or device which created that file. For example, a digital camera photograph often has hidden data which contains information identifying the camera which manufactured it, and the date the image was taken. Some file systems for computers also permit the storage of alternate data streams, whereby a file such as a text file may hide an image file which would not be immediately visible to an end user without some action taken. Your affiant is aware that both metadata and alternative data streams may contain information which may be relevant to child pornography offenses. Metadata and alternative data streams are often identified and processed automatically by computer forensic utilities. Your affiant intends to review any such data which is flagged by any process above as being relevant to the receipt, possession, distribution, and transportation of child pornography.

    21.   With rare exception, the above-listed search techniques will not be performed on original digital evidence. Instead, your affiant is aware that the first priority of a digital evidence forensic examination is the preservation of all data seized. As such, original digital media will be, wherever possible, copied, or "imaged," prior to the start of any search for evidence. The copy will be authenticated digitally as described in the paragraph below.

1   22.   Your affiant is aware that a digital forensic image is the best possible copy that can be

2   obtained for a piece of digital media.  Forensic imaging tools make an exact copy of every accessible

3   piece of data on the original digital media.  In general, the data contained on the original media is run

4   through a hashing algorithm as described above, and a hash value for the entire device is generated.

5   Upon completion of the imaging process, the same hash algorithm is run on the imaged copy to insure

6   the copy is an exact duplicate of the original.  Upon the completion of the search processes described

7   above, which are performed on the image of the hard drive, the hash algorithm is again run on the image

8   copy to insure no alterations of the data occurred during the examination process.

9   23.   As previously mentioned, in the event that a piece of digital media is found not to be (a)

10  an instrumentality of the offense, (b) a fruit of the criminal activity, (c) contraband, or (d) evidence of the

11  offenses specified herein, it will be returned as quickly as possible, not to exceed 120 days.

12  24.   Your affiant also requests judicial authorization to retain copies of all seized storage

13  media after the review is complete.  Criminal Procedure Rule 41 specifically states "The officer may

14  retain a copy of the electronically stored information that was seized or copied."  Fed. R. Crim. P. 41

15  (f)(1)(B).

16  25.   That Judicial authorization is justified in this case in part because:

17      a.  Should the execution of the warrant uncover data that may later need to be introduced

18          into evidence during a trial or other proceeding, the authenticity and the integrity of the

19          evidence and the government's forensic methodology may be contested issues.  Retaining

20          copies of seized storage media may be required to prove these facts and the investigator

21          may retain a copy of seized or electronically stored information pursuant to Fed. R. Crim.

22          P. 41(f)(1)(B):

23      b.  Returning the original storage medium to its owner will not allow for the preservation of

24          that evidence.  Even routine use may forever change the data it contains, alter system

25          access times, or eliminate data stored on it.

26      c.  Because the investigation is not yet complete, it is not possible to predict all possible

27          defendants against whom evidence found on the storage medium might be used.  That

28          evidence might be used against persons who have no possessory interest in the storage

21

media, or against persons yet unknown. Retention of a complete image assures that it will be available to all parties, including those known now and those later identified. Forensic analysis may identify the user names and screen names of those distributing child pornography to the user of the target computer(s).

d.  The act of destroying or returning storage medium could create an opportunity for a defendant to claim, falsely, that the destroyed or returned storage medium contained evidence favorable to him. Maintaining a copy of the storage medium would permit the government, through additional warrant if necessary, to investigate such a claim.

e.  Similarly, should a defendant suggest an explanation for the presence of evidence on storage medium or some defense, it may be necessary to investigate such an explanation or defense by, among other things, re-examining the storage medium with that explanation or defense in mind. This may require an additional examination of the storage medium for evidence that is described in Attachment B but was not properly identified and segregated previously.

26.   Your affiant has not attempted to acquire the sought after material through any other investigative or judicial process.

27.   Contextual evidence that establishes how computers were used, the purpose of their use, and who used them is a conclusion, based on a review of all available facts and the application of knowledge about how a computer behaves. Therefore, such evidence necessary to understand the evidence described in Attachment B is included within the scope of this warrant and will seized.

28.   Although it is not possible to accurately predict who will conduct the forensic review, it is possible that the team may include one or more agents, computer specialists, analysts, and/or attorneys including members of the investigative team. The team will not necessarily consist only of persons with those job descriptions, and by referencing those job descriptions, this affiant does not intend to represent anything about the manner in which the team will conduct its review. It is also possible that the review "team" will consist of a single person.

22

1 **FACTS ESTABLISHING PROBABLE CAUSE**

2      29.    On November 16, 2016, Michael Emerton was arrested by Hertfordshire Constabulary in

3 England in relation to the sexual abuse of his three minor children.  During the forensic extraction of

4 Emerton's seized devices, there were several Skype chats present.   One of the users that Emerton was

5 chatting with was PYRATEPROPHOTOG.  During the chat, the user PYRATEPROPHOTOG stated he

6 sexually abuses ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  Numerous images were recovered

7 from Emerton's devices which showed screen captures of Skype/webcam conversations where the user

8 PYRATEPROPHOTOG sits facing the webcam, while a young female masturbates his erect penis.

9      30.    On February 3, 2017, your affiant made an emergency request to Microsoft for the

10 subscriber information and IP history for the Skype user PYRATEPROPHOTOG.  According to

11 Microsoft, the user account was created on ▓▓▓▓▓▓▓▓▓▓ th an email address of

12 ▓▓▓▓▓▓▓▓▓▓▓▓.   There were no login IP addresses for the most recent thirty (30) days.

13      31.    On February 3, 2017, your affiant made an emergency request to Google for subscriber

14 information and IP history the ▓▓▓▓▓▓▓▓▓▓▓.  According to Google, the account

15 belonged to Py Prof with a second email address of ▓▓▓▓▓▓▓▓▓ and a most recent IP

16 login from ▓▓▓▓ on January 1, 2017.

17      32.    Further investigation revealed that the IP Address, ▓▓▓▓▓▓ is owned by Wave

18 Communications (hereinafter "Wave"), and that the numbers contained therein indicate that the user was

19 located in the Auburn, California area.  On February 3, 2017, your affiant made an emergency request to

20 Wave requesting subscriber information associated with the SUBJECT PREMISES and the IP address

21 ▓▓▓▓▓▓▓ at was utilized between January 1, 2017 at 0933 hours UTC and January 2, 2017 at 1605

22 hours UTC.

23      33.    On February 4, 2017, Wave responded to the aforementioned emergency request.

24 According to Wave, the IP address referenced above is registered to customer Christopher LEE at the

25 SUBJECT PREMISES.

26      34.    Your affiant received three images retrieved from Emerton's devices which appear to be

27 screen capture images of webcam communications with PYRATEPROPHOTOG.  I saw that the male in

28 these images is described as a white male, approximately 50-60 years of age, glasses, bald head with a

1  mustache. The minor female in the images is described as ███████████████

2  ████████████

3       35.     According to British law enforcement, they found eighteen (18) screen captures on

4  Emerton's devices which documented Skype chat and video messages between Emerton and

5  PYRATEPROPHOTOG. I have read the chats. In them, each Skype user discusses watching the other

6  sexually abuse a child. There are three dates when Emerton took screen captures of these chat sessions:

7  ██████████████████████████████████████████████ The screen captures all show the same

8  white adult male with the same young white female, ████████████████████ According to the

9  British report, on all three dates, there are screen captures where the young female is holding the male's

10 erect penis in an appearance that she is masturbating him. During the Skype chat on ████████████

11 the screen shot shows the female child holding something white between her naked legs. The chat that is

12 detailed next to the picture shown states:

| 07/12/2015 | 23:37:48 | berkonudefam | ok |
|---|---|---|---|
| 07/12/2015 | 23:38:19 | berkonudefam | can I see more of her:) whats her name again? |
| 07/12/2015 | 23:38:46 | pyrateprophotog | [FIRST NAME REDACTED BY AFFIANT] |
| 07/12/2015 | 23:38:51 | berkonudefam | oh lovely name |
| 07/12/2015 | 23:39:51 | pyrateprophotog | want to cum for her? |
| 07/12/2015 | 23:40:03 | berkonudefam | yeah |
| 07/12/2015 | 23:40:07 | berkonudefam | hold on getting other camera |
| 07/12/2015 | 23:41:29 | pyrateprophotog | nice |
| 07/12/2015 | 23:42:02 | berkonudefam | ismmmm |
| 07/12/2015 | 23:42:06 | berkonudefam | how far u gone with her |
| 07/12/2015 | 23:42:38 | pyrateprophotog | cum |
| 07/12/2015 | 23:42:39 | berkonudefam | she wanan see his dick |



       36.     I obtained information from the California DMV.

Included herein is LEE's driver's license photo.

24

As the reader can see, LEE's driver's license photograph matches two of the images that the British police sent me of PYRATEPROPHOTOG. I have redacted these photographs to obscure the face of the little girl. He appearance is consistent with the the victim discussed and depicted in the chat sessions.



37.     Further investigation supports the belief that LEE resides at the SUBJECT PREMISES. The local police department verified LEE as the resident of the SUBJECT PREMISES as of July 2016, and also verified ███████████████████████████████████████████ ███████████████████████████████ January 2017, the post office delivered two packages to LEE at the subject premises.

1       38.    Information obtained from California Department of Motor Vehicles (DMV) shows that

2 LEE has two vehicles registered to him at the SUBJECT PREMISES. The vehicles are described as a

3 2014 Toyota with CA plate ████ and a 2007 Ford with CA plate ████. LEE's California

4 driver's license lists the SUBJECT PREMISES as his residence.

5 **REQUEST FOR SEALING**

6       39.    It is respectfully requested that this Court issue an order sealing, until further order of the

7 Court, all papers submitted in support of this application, including the application and search warrant. I

8 believe that sealing this document is necessary because the items and information to be seized are

9 relevant to an ongoing investigation run by Homeland Security Investigations. As such, premature

10 disclosure of the contents of this affidavit and related documents may have a significant and negative

11 impact on the continuing investigation and may severely jeopardize its effectiveness. Also, this affidavit

12 contains information about a minor victim whose privacy is protected by 18 U.S.C. § 3509(d).

13 **CONCLUSION**

14       40.    Based on the aforementioned factual information, your affiant respectfully submits that

15 there is probable cause to believe that an individual at the location described in Attachment A is involved

16 in the production, transportation, and distribution, of visual depictions of minors engaged in sexually

17 explicit conduct. Your affiant respectfully submits that there is probable cause to believe that an

18 individual at the residence described above has violated 18 U.S.C. §§ 2251, 2252 and 2252A and that

19 evidence, fruits, and instrumentalities of the above-described offenses, as more particularly described in

20 Attachment B, are likely to be found at the SUBJECT PREMISES.

21       41.    ████████████████████████████████████

22 ████████████████████████████████████████████████████

23 ████████████████████████ons. LEE owns handguns and rifles and local

24 authorities advise that LEE is a gun broker. This investigation has revealed highly emotionally charged

25 facts and it is possible that if law enforcement does an ordinary knock-and-announce, LEE would be

26 emotional and able to endanger law enforcement, himself, or his victim. The request is made for a No

27 Knock warrant.

28

26

42.    I swear, under penalty of perjury, that the foregoing information is true and correct, to the best of my knowledge, information and belief.

Nicole Solander
Special Agent
Homeland Security Investigations

Approved as to form.

Matthew Segal
~~Special~~ Assistant United States Attorney

Subscribed and sworn to before me this

4 day of February, 2017

HON. KENDALL J. NEWMAN
United States Magistrate Judge
Eastern District of California
Sacramento, California

Signed
Telephonically
2/4/17
1:50pm

27